# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

United States of America

v.

Troy Alexander

Defendant.

Criminal Action No. 19-34-CFC

---

Jennifer K. Welch and Carly A. Hudson, Assistant United States Attorneys

*Counsel for United States*

Anthony J. Petrone, LAW OFFICES OF ANTHONY J. PETRONE, Philadelphia, Pennsylvania; Gary S. Silver, SILVER LEGAL SERVICES, Philadelphia, Pennsylvania

*Counsel for Defendant*

## <u>MEMORANDUM OPINION</u>

March 17, 2020
Wilmington, Delaware

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Defendant Troy Alexander has moved to suppress physical evidence seized from two homes in Wilmington, Delaware by a Drug Enforcement Administration (DEA) task force and statements he made to law enforcement before and after his arrest. *See* D.I. 30 & D.I. 38. The parties have filed numerous briefs and I held two evidentiary hearings on this motion. *See* D.I. 30; D.I. 38; D.I. 39; D.I. 45; D.I. 46; D.I. 48; D.I. 49; D.I. 51; D.I. 64; D.I. 66; D.I. 67; D.I. 68.

## I. FINDINGS OF FACT

### A. November 19, 2018

In October 2018 the DEA task force, which consisted of agents from the DEA, agents from the U.S. Department of Homeland Security, and Delaware police officers, began an investigation of Alexander for suspected distribution of cocaine. On November 19, 2018, task force officers authorized and oversaw a controlled purchase of cocaine from Alexander by a Confidential Source (the CS). In a recorded call, Alexander instructed the CS to meet him on the 700 block of East 6th Street in Wilmington to complete the purchase. Alexander lived with his sister on that block at 728 East 6th Street.

Four minutes after the CS arrived at the 700 block of East 6th Street, task force officers saw Alexander exit 722 East 7th Street, the home of his girlfriend

Venus Nelson. Nelson's home is a block away from Alexander's residence. Alexander took three minutes to walk from Nelson's home to the CS. Task Force Officer Paul Lawrence then saw Alexander give the CS what turned out to be 111.4 grams of cocaine in exchange for cash provided to the CS by the DEA. D.I. 67 at 74:4; 79:2–7. Although the officers provided the CS with an audio/visual recorder to record the purchase, the CS failed to take it out of his pocket. Consequently, the transaction was audio recorded, but the video recording captured only the inside of the CS's pocket. D.I. 67 at 58:3–8.

Immediately after the transaction, Alexander got in his car and drove from the scene. Task force officers initially conducted mobile surveillance of Alexander's car; but they called off their surveillance when Alexander circled a city block, leading the officers to infer that Alexander was engaged in counter surveillance.

**B.    November 28, 2018**

On November 28, the CS again made a recorded cell phone call to Alexander under the supervision of task force officers. Alexander told the CS that he was in Philadelphia and would return to Delaware around 7:00 p.m. D.I. 30, Search Warrant Affidavit ¶ 20. The CS had previously informed task force officers that Alexander told the CS that Alexander obtained his drugs from a supplier in Philadelphia. D.I. 67 at 91:9–12. The officers also were generally

aware that Philadelphia is a source city for drugs sold in northern Delaware. As a result, the officers suspected that Alexander may have been purchasing drugs in Philadelphia that evening and would be returning to Wilmington with a supply of drugs for eventual redistribution in Wilmington. D.I. 67 at 49:11–18, 91:9–12. Accordingly, the task force set up surveillance around Alexander's residence.

At approximately 6:38 p.m. that evening, task force officers saw Alexander park a silver Audi with a temporary New Jersey license plate on the 700 block of East 6th Street. The CS had told officers the day before that Alexander had purchased a silver Audi with a New Jersey temporary registration. Alexander got out of the Audi, opened the front passenger door, removed a large white bag, and carried the bag into his residence. The officers who observed Alexander inferred that the bag was heavy because Alexander struggled to carry it. D.I. 30, Search Warrant Affidavit ¶ 22. Two minutes later, Alexander emerged from the residence with a large white bag. *Id.* ¶ 23. This bag also appeared to be heavy based on Alexander's struggle to carry it. *Id.* Alexander immediately walked to Nelson's home and used a key to enter the front door. *Id.* The walk from the residence to Nelson's home took about a minute. *Id.*

Four minutes later, task force officers saw Alexander leave Nelson's home empty handed. *Id.* ¶ 24. Alexander immediately walked back to and entered his residence. *Id.*

Three minutes later, at approximately 6:52 p.m., the DEA had the CS make a recorded call to Alexander. *Id.* ¶ 25. The CS asked Alexander if Alexander wanted money the CS owed him from the last cocaine purchase. *Id.* Alexander told the CS that he would get the money from the CS the next day. *Id.* Alexander also told the CS that he did not have "anything" but that he "might be ready tomorrow." *Id.*

At 7:17 p.m., task force officers saw Alexander leave his residence and immediately walk to and use a key to enter Nelson's home. Within a minute or two of entering Nelson's home, Alexander exited the home, carrying a large black trash bag. *Id.* ¶¶27–28. Alexander struggled to carry the bag, presumably because of its weight. *Id.* ¶ 28. He immediately walked to and entered his residence at approximately 7:20 p.m. *Id.*

As these events unfolded, the task officers provided contemporaneous updates by radio and telephone to the investigation's case agent, Paul Lawrence, who had remained at the DEA's New Castle Office. Based on Alexander's movements, the monitored calls with the CS, the November 19, 2018 controlled drug buy, and the task force officers' general knowledge that Philadelphia is a source of supply for drugs sold in Wilmington, Lawrence began to draft an affidavit to support search warrant applications for both Nelson's home and Alexander's residence. D.I. 67 at 49:19–50:10, 51:20–52:7.

At 8:12 p.m., task force officers saw a Kia Optima pull up to Alexander's residence. D.I. 30, Search Warrant Affidavit ¶ 29. A female passenger got out of the Kia, entered the residence, and exited a few minutes later with what appeared to be the same black bag that Alexander had been carrying earlier. D.I. 67 at 101:22–102:25. The female passenger got back into the Kia, and officers in unmarked vehicles followed the Kia as it drove off.

At 8:20 p.m., Officer Lawrence emailed an Assistant United States Attorney a draft of his affidavit for the search warrants. Ex. 3. The draft recounted among other things Alexander's movements between 6:58 and 7:20 p.m. that evening, the CS's monitored calls with Alexander, and the November 19 controlled purchase.

At approximately 8:21 p.m., officers tried to execute a car stop on the Kia. D.I. 30, Search Warrant Affidavit ¶ 30. The officers believed at the time that the Kia was far enough from the 700 block of East 6th street that a car stop would not alert anyone back at Alexander's residence. D.I. 67 at 103:6–16. The Kia came to a momentary stop, but then successfully fled the scene, smashing into several of the officers' vehicles in the process. D.I. 30, Search Warrant Application ¶ 30.

At this point, surveillance officers saw Alexander leave his residence. *Id.* ¶ 31. Alexander was talking on his cell phone at the time. He got into his car and drove away.

Concerned that Alexander may have been tipped off by the Kia occupants, at approximately 8:30 p.m. task force officers executed so-called "hit-and-holds" on Alexander's residence and Nelson's home, as Lawrence worked to finalize his affidavit and apply for search warrants. D.I. 68 at 18:15–19:2, 48:7–49:25; D.I. 67 at 51–54. That is to say, officers simultaneously entered both houses, performed protective sweeps, and handcuffed the occupants to assure the safety of law enforcement and prevent the destruction of evidence while search warrants were being obtained. D.I. 68 at 18–21.

### 1.    Nelson's Home

Nelson was in her bedroom on the second floor of her home watching television when task force officers and agents executed the hit-and-hold on her home. D.I. 68 at 48:21–49:2. Hearing a commotion downstairs, Nelson opened her bedroom door and found the officers and agents in her stairwell. D.I. 68 at 49:8–22. Nelson was placed in handcuffs and seated on a couch in the living room. D.I. 68 at 24:22–24. Officers then performed a sweep of the home to make sure no one else was present. D.I. 68 at 25:19–22.

The parties dispute what happened next. Homeland Security Special Agent Tony Salvemini, who participated in the hit-and-hold at Nelson's home, testified that Nelson orally consented to a search of the home. According to Salvemini:

> [Nelson] was, you know, naturally surprised and, you know, police bust down your door, come to your house. It

6

was a normal reaction. She was, you know, surprised, probably a little alarmed at first. But she calmed down. She realized, you know, she was safe and, you know, she was compliant.

Q.     Okay. So what did you say to Ms. Nelson when your conversation began?

A.     I introduced myself. She kind of said, you know, what's going on? What are you looking for? I told her that we were looking for [Alexander] and she said, well, you know, where is he, something to that effect.

We told her that we were in the process of applying for a search warrant, a federal search warrant to search the residence. You know, she kind of said, what are you looking for? And I said, any evidence of drug dealing. I may have said something like, you know, you know what [Alexander] does. She said that there were some firearms upstairs that belonged to her, but they were legal, and I said, okay. That's fine. I asked her if there were any other guns in the house. She said no.

During this time, one of the officers came up and whispered in my ear that during their sweep of the basement they located what appeared to be a large amount of cocaine. I told Ms. Nelson that, you know, we were applying for a search warrant, but based on what I had seen that evening and what we had there at the house, I didn't think it was going to be any problem getting one. I did tell her that if she wanted to consent of the search of the house, that it would save everybody a lot of time, but it was her right to refuse if she, if she wished.

Q.     And what did she say in response?

A.     She said, go ahead and search the house.

Q.     Did her demeanor change at all throughout the course of your conversation?

A.     No. I mean, it really wasn't a long conversation. No.

Q.     When the officer whispered in your ear that something had been found in the basement, was it your understanding that the cocaine was -- did they have to sort of turn over boxes or do a search in order to find it?

A.     He used the words plain view.

* * * *

> Q.  Okay. Did you have Ms. Nelson execute a consent search form?
> A.  No, I did not.
> Q.  Are you aware of whether any other agents had her execute a consent to search form?
> A.  I don't. I don't recall it, if we ever did one.
> Q.  All right. Have you been through the file in this case to see whether there is a consent to search form in the file?
> A.  Yes.
> Q.  And is there one?
> A.  No.

D.I. 68 at 26:7–27:25; 28:10–21.

For her part, Nelson testified that she gave written, but not oral, consent to the search. D.I. 68 at 52:9–53:18. And she testified that the officers started removing things from her basement before she consented to a search. D.I. 68 at 51:1–7

I found Salvemini's testimony to be credible. He spoke directly and with appropriate confidence both on direct and cross examination. His testimony was consistent and forthcoming and not overreaching.

I did not find Nelson's testimony to be credible. Nelson, who has been Alexander's girlfriend for 17 years, D.I. 68 at 57:13–15, admitted that she had conducted legal research for Alexander and "wanted to help him argue that [her] consent was not valid," D.I. 68 at 66:15–17. Text messages between Nelson and Alexander while Alexander was incarcerated and awaiting the suppression hearing

showed that Nelson was desperate for Alexander's affection and upset that

Alexander had taken her off his prison visitor list. For example, in April 2019,

Nelson texted Alexander:

> Can you share with me why you are so angry with me
> because I'm all the way lost! I remember you said that I
> wasn't playing my part, you have too many players for me
> to even secure a position to play a part. I can understand
> a portion of your feelings but the other portion of your
> harshness towards me is unacceptable. I need to hear your
> voice. I told you that whatever you were concerned with
> you are right. . . . My responsibility and obligation to you
> for the time that you are [in prison] is to make sure you
> don't need anything in the same way you did for me. My
> obligation is not to debate with you or have to even worry
> about a position or parts that you need to be played.
> Moving forward if you ask me to do anything it will be
> done and that is it. . . . I have been texting you [d]ay in
> and day out with no response. I have sent you numerous
> pictures [with] no response. I have sent you books and
> magazines[.] I have told you I loved you and would
> remain stationary until you get home . . . . There is nothing
> more for me to but come visit you but you have childishly
> taken me off your list because you are angry . . . Simple
> question is what do you want me to do.

Ex. 10. A subsequent text from Nelson makes clear that Nelson's consent to the

search of her home was the reason Alexander was angry with her and had removed

her from the visitor list: "[Y]ou already had it planned that you were taking me off

the visiting list[.] [Y]ou already had it planned that you were going to try to hold

over my head about the consent." Gov't Ex. 11. Based on these text messages and

9

Nelson's demeanor on the stand, I discredit her testimony and find as a matter of fact that Nelson orally consented to the search of her home.

Because Nelson consented to a search, Lawrence did not pursue an application for a search warrant of her home. D.I. 67 at 53:25–54:4. Task force officers seized from the home's basement powder and crack cocaine, cutting agent, two scales, and a kilogram press with molds. They also seized two handguns and an extended magazine for a .40 caliber handgun located in the master bedroom and three scales discovered in an upstairs closet.

### 2. Alexander's Residence

In the meantime, Lawrence added to his affidavit a description of the failed Kia stop and Alexander's contemporaneous exit from his residence, D.I. 30, Search Warrant Affidavit ¶¶ 29–31. Lawrence then applied for and obtained a search warrant for Alexander's residence. In executing that warrant, officers seized approximately $67,000 in cash, a handgun and 285 rounds of ammunition found in the master bedroom, a 9mm handgun and digital scale hidden in the living room couch, a Rolex watch, two diamond chains, and various documents in Alexander's name that listed the residence as his address.

### C. Alexander's Statements

### 1. Alexander's Pre-arrest Statement

At approximately 8:48 p.m., just after Nelson's home had been secured with the hit-and-hold, Alexander "walked hastily" to the front of the home, where four

10

police officers stood. D.I. 68 at 8:11–18, 11:19–20. As Alexander reached the

officers, he stated: "I heard you guys were looking for me. I don't want my sister

or anyone else to get in trouble. All that stuff in there is mine." D.I. 68 at 8:20–

22. At this point two of the officers handcuffed Alexander and placed him under

arrest.

Task force officer Antonio Tiberi testified that Alexander made this

statement as soon as he made contact with the officers and that the statement was

not made in response to a question or statement from law enforcement. D.I. 68 at

8:14–9:7. Alexander, however, testified as follows in response to questions from

his attorney:

> I walked up to the scene. I seen the police. I said, I'm the
> one you're all looking for. They was, like, what's your
> name? I told them, Troy Alexander.
>
> One of them just told me to turn around, put your
> hands behind you back. You don't have any guns or drugs
> or anything that could hurt us? I'm like, no. They searched
> me, whatever.
>
> One of the cops stated, we found a whole bunch of
> stuff in this house. Your girl is going down, going down
> for this. That's when I came out and said, she ain't got
> nothing to do with it. Whatever is in there is mine.
> Q. Okay. Up until that point, had any police officer
> advised you of your Miranda rights?
> A. No.
> Q. And that statement that you just made about all the
> stuff in there being yours, that was in response to the
> comment that the police officer made to you about your
> girlfriend going down for the stuff found in the house; is
> that correct?
> A. Yes.

D.I. 68 at 73:18–74:12.

I credit Tiberi's testimony, not Alexander's. Tiberi's answers to questions were direct, responsive, and consistent. Alexander, by contrast, was evasive on cross-examination, and, at times, combative. *See, e.g.*, D.I. 83:16–17 (Alexander responding on cross-examination "so what is the relevance of that question?").

## 2. Alexander's Post-arrest Statements

After Alexander was handcuffed, he was placed in a DEA car. Shortly thereafter, Agent Salvemeni met Alexander at the car and read him his *Miranda* rights. D.I. 68 at 35:2–13. Alexander acknowledged that he understood his rights and Salvemeni asked him where the Audi was. Alexander told him the location of the Audi.

Officers brought Alexander to the DEA's New Castle office and placed him in a cell block. D.I. 67 at 59–60. Officer Lawrence, who had been told that Alexander had been read his *Miranda* rights, introduced himself to Alexander and told him that he was the primary case agent and would be speaking with Alexander throughout the evening. D.I. 67 at 60:22–25. Alexander responded: "I don't want my girl to get in any trouble . . . anything in there is mine." D.I. 67 at 61:8–9. Lawrence left to coordinate with the U.S. Attorney's Office for the District of Delaware. D.I. 67 at 62:7–12. When he returned to have a "formal conversation"

with Alexander, Alexander stated that he had nothing further to say. D.I. 67 at 63:1–4.

The DEA then arranged to transport Alexander to the Department of Corrections so that Alexander could be housed overnight. As Alexander left the DEA office, Alexander asked the officer transporting him to turn around because Alexander wanted to speak with Lawrence. D.I. 67 at 63:16–20. Alexander was then returned to the DEA office for a recorded interview.

Prior to giving his recorded statement, Alexander was given a form that advised him of his *Miranda* rights. *See* Gov't Ex. 4. On that form, Alexander wrote "yes" next to "Do you understand your rights?" *See id.* Alexander wrote "yes" next to "Are you willing to answer some questions?" *See id.* And Alexander signed the form. *See id.* In the recorded interview, task force officers can be heard walking Alexander through the form that advised him of his *Miranda* rights and Alexander can be heard acknowledging that he understood those rights and stating that he was choosing to speak with the officers notwithstanding his right not to do so. *See* Gov't Ex. 1. Alexander then proceeded to give a recorded statement in which he described his drug dealing activities, identified his supplier, acknowledged that the cocaine and cutting agent found in Nelson's home were his, and acknowledged that the gun found in the couch of his residence was his. *See id.*

## II.    LEGAL STANDARDS

Alexander seeks the suppression of the evidence seized by the task force from his residence and Nelson's home and the statements he made to task force officers.  He argues that the searches of his residence and Nelson's home violated his Fourth Amendment rights and that his statements were obtained in violation of his Fifth Amendment rights.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV.  It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Id.*  "The ultimate touchstone of the Fourth Amendment . . . is reasonableness." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (*per curiam*) (quotation marks and citation omitted).  To deter the state from violating the Fourth Amendment, evidence collected through an unreasonable search or seizure may be suppressed. *See United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014).

The Fifth Amendment of the United States Constitution provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any

> person be subject for the same offense to be twice put in
> jeopardy of life or limb; nor shall be compelled in any
> criminal case to be a witness against himself, nor be
> deprived of life, liberty, or property, without due process
> of law; nor shall private property be taken for public use,
> without just compensation.

U.S. Const. amend. V. The Supreme Court has interpreted the prohibition against

the government compelling a person to be a witness against himself in a criminal

case to guarantee suspected criminals certain procedural safeguards. *See Miranda*

*v. Arizona*, 384 U.S. 436, 444 (1966). When the government obtains a statement

from a suspected criminal in violation of the suspected criminal's *Miranda* rights,

those statements may be suppressed. *See United States v. Warren*, 642 F.3d 182,

183 (3d Cir. 2011).

## III.   ANALYSIS

### A.   The Hit-and-Holds

"It is a basic principle of Fourth Amendment law that searches and seizures

inside a home without a warrant are presumptively unreasonable." *Brigham City,*

*Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks and citations omitted).

Nevertheless, the Supreme Court has held that "the warrant requirement is subject

to certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011)

(citation omitted). As the Third Circuit explained in *United States v. Rubin*, 474

F.2d 262 (3d Cir. 1973):

> When Government agents . . . have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

474 F.2d at 268–69 (quotation marks and citations omitted).

In this case, task officers had probable cause to believe at approximately 8:30 p.m. on November 28, 2018 that Alexander had cocaine and other evidence of drug dealing in both his residence and Nelson's home. Such probable cause existed based on (1) the November 19 controlled purchase of cocaine from Alexander; (2) the fact that Alexander exited Nelson's home immediately before meeting the CS for that controlled purchase; (3) Alexander's statement to the CS that he was in Philadelphia and would return to Wilmington around 7:00 p.m.; (4) the officers' general knowledge that Philadelphia was a source of cocaine for Wilmington; (5) the fact that the CS had told officers that Alexander's source of

drug supply was in Philadelphia; (6) Alexander's statement to the CS that he "might be ready tomorrow" to provide the CS with cocaine; (7) Alexander's carrying into his residence the white bag and the subsequent back-and-forth movements between his residence and Nelson's home with a bag in hand; (8) the fact that the woman passenger in the Kia entered Alexander's residence empty-handed and then minutes later exited the residence with what appeared to be the same black trash bag that Alexander had carried from Nelson's home to the residence less than 30 minutes earlier; and (9) the fact that the Kia fled from police and struck police cars in doing so.

Moreover, because of the Kia's flight from the attempted car stop and the officers' observation immediately thereafter of Alexander on his cell phone outside the residence, the officers had reason to believe that Alexander and anyone in the residence or Nelson's home had been tipped off about the officers' failed attempt to stop the Kia and thus the officers had reason to believe that any cocaine or related evidence of drug dealing in the residence or Nelson's home would be imminently destroyed. Accordingly, given the degree of urgency involved, the amount of time necessary to obtain a warrant, the ready destructibility of cocaine, and the reasonableness of the officers' belief that any cocaine would be destroyed by any occupants of Alexander's residence or Nelson home, exigent circumstances existed to justify the hit-and-holds executed by the task force that evening.

## B.    Alexander's Residence

Alexander argues that the search warrant for his residence was invalid because Officer Lawrence's affidavit "failed to establish probable cause that [Alexander] was storing drugs in his home." D.I. 30 at 15. "The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether the magistrate [who issued the search warrant] had a substantial basis for concluding that probable cause existed." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quotation marks and citation omitted). In this case, Lawrence's affidavit detailed the same facts discussed above. And, as discussed above, those facts provided probable cause to believe that cocaine and evidence of drug dealing would be found in Alexander's residence.

Alexander also argues that Lawrence's affidavit was invalid under *Franks v. Delaware*, 438 U.S. 154 (1978), because it was based on two false statements. Alexander argues first that Lawrence's statement that "the CS placed a series of consensually monitored and recorded cellular telephone communications to [Alexander]" was false. D.I. 30, Search Warrant Affidavit ¶ 10. But Lawrence credibly testified that the CS made two recorded phone calls, and that by "series" he meant more than one call. Thus, this statement was not false. Alexander argues next that Lawrence's statement that the CS "was provided . . . an audio/video monitor/recorder to monitor/record the transaction" was false. *Id.* ¶ 11. But

Lawrence credibly testified that the CS was provided with an audio/video recorder, and it is undisputed that the CS used the recorder to record his drug deal with Alexander, even though the video recorder captured only the inside of the CS's pocket. Accordingly, Lawrence's statement was not a material or false representation and I will deny Alexander's *Franks* challenge.

Finally, as I did at the second hearing on Alexander's motion to suppress, I note that I would uphold the officers' search of Alexander's residence under *United States v. Leon*, 468 U.S. 897 (1984), because the officers acted in good faith reliance on the warrant. D.I. 68 at 102:9–12. Alexander contends that the good-faith exception should not apply because "no officer could have reasonably relied on this facially deficient warrant[,]" D.I. 30 at 16, but because I find that the warrant was not deficient it follows *a fortiori* that the warrant was not so facially deficient that an officer could not have reasonably relied on it.

### C. Nelson's Home

Alexander challenges whether Nelson's consent to a search of her home was validly obtained by the DEA. "[A] search conducted pursuant to consent is one of the specifically established exceptions to the search warrant requirement." *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (citation omitted). The Supreme Court has said that "whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be

determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (quotation marks omitted). Among the factors a court should consider in this totality of the circumstances test are "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." *Givan*, 320 F.3d at 459 (citation omitted).

The consent was obtained from Nelson in her home. Although the task force had already entered the house, detained Nelson, and performed a protective sweep, there is no indication that those actions put undue pressure on Nelson. Agent Salvemini testified that Nelson was calm and compliant when he obtained her consent to search. He further testified that he told Nelson that she had the right to refuse consent. Nelson was 48 years old at the time she consented to the search and she had experience in dealing with law enforcement. Indeed, she testified that in 2013 she had consented to another police search of her home. Neither the substance of her testimony nor the manner in which she testified suggested that she would be particularly susceptible to pressure from law enforcement. Considering the totality of the circumstances, I find that Nelson's consent was given voluntarily and that the consent search was a valid search.

#### D. Alexander's Pre-arrest Statement

A suspected criminal has *Miranda* rights—including the right to remain silent—"in the context of custodial interrogation[.]" *Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994). Thus, *Miranda* does not apply when a suspected criminal is not in custody. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*). Moreover, in *Miranda* itself, the Supreme Court held that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478.

Alexander seeks to suppress the statement he made outside Nelson's home. Officer Tiberi, however, credibly testified that as Alexander walked up to officers standing outside Nelson's home he said "I heard you guys were looking for me. I don't want my sister or anyone else to get in trouble. All that stuff in there is mine." Because Alexander made this statement as he walked up to the officers, he was not in custody at the time and *Miranda* does not apply. Additionally, Alexander volunteered this statement. It was not a response to a question or statement from an officer; nor was it coerced in any way. Accordingly, there is no legal basis to suppress the statement Alexander made at Nelson's home.

#### E. Alexander's Post-arrest Statements

Alexander also seeks to suppress the statement he made in the cell block of the DEA's New Castle office. A suspected criminal can, if he so chooses, "waive

his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily."
*United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (citation omitted).
Voluntary statements made after a waiver of *Miranda* rights should not be
suppressed. *Id.* at 248.

Agent Salvemini testified that he read Alexander his *Miranda* rights after
Alexander was taken into custody outside Nelson's home and that Alexander
waived his *Miranda* rights. Because this waiver occurred before Alexander made
his statement in the cell block, there is no basis to suppress the statement.

Alexander also seeks to suppress his recorded statement. But Alexander
executed a written waiver of his *Miranda* rights before making the recorded
statement. Indeed, task force officers can be heard on the recording walking
Alexander through the form that advised him of his *Miranda* rights, and Alexander
can be heard acknowledging that he understood those rights and stating that he was
choosing to speak with the DEA anyway. Alexander then gave the recorded
confession to the officers. Thus, there is no basis to suppress the recorded
statement.

## IV. Conclusion

For the foregoing reasons, I will deny Defendant Troy Alexander's Motion
to Suppress Physical Evidence and Statements (D.I. 30) and Defendant Troy

Alexander's Supplemental Motion to Suppress Physical Evidence and Statements (D.I. 38).

The Court will issue an order consistent with this memorandum opinion.